E-FILED
Monday, 04 May, 2026  02:26:33 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

ROCK ISLAND DIVISION

| | |
|---|---|
| TAUSEEF AHMED AND ANTHONY CATALFANO, PLAINTIFFS,<br><br>ON BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED<br><br><br>V.<br><br><br>DEERE & COMPANY, DEERE & COMPANY AS ADMINISTRATOR OF EMPLOYEE WELFARE BENEFITS PLAN AND DEERE & COMPANY SEVERANCE PAY PLAN FOR SALARIED EMPLOYEES (ALSO KNOWN AS JOHN DEERE SEPARATION PROGRAM), DEFENDANTS | COMPLAINT AND JURY DEMAND |

Tauseef Ahmed and Anthony Catalfano, through their attorneys, Dorothy A. O'Brien of O'Brien and Marquard, PLC, and Melissa C. Hasso of Hasso and Wilson Law Firm PLLC, state for their Complaint against Deere & Company, Deere & Company as Administrator of Employee Welfare Benefit Plan, and Deere & Company Severance Pay Plan for Salaried Employees (also known as John Deere Separation Program):

*Introduction and Jurisdiction*

1. This Complaint contains claims for violations of ERISA on behalf of employees whose employment was terminated without severance benefits consistent with Deere's employee benefit plan. The allegations include improper failure to grant benefits in accordance with plan requirements and breach of fiduciary duty.

2. Plaintiffs seek to bring the severance pay claims as a class action under F. R. Civ. Proc. 23 on behalf of themselves and other similarly situated terminated employees.

3. The class claims are based on the *Employment Retirement Income Security Act*, 29 USC 1001 et seq.

4. This Complaint also contains an individual discrimination claim brought by a former employee of Deere & Company whose employment terminated on April 23, 2025 after having been employed for 24+ years.

5. The individual claim is based on 1) 42 U.S.C. 2000e (Title VII) which prohibits discrimination based on race, national origin and religion; 2) the *Illinois Human Rights Act*, 775 ILCS 5/1-101 et seq, which also prohibits discrimination in employment on the basis of race, national origin, age and/or religion and 3)the Age Discrimination in Employment Act, 29 USC 621 et seq. which prohibits discrimination based on age.

6. Based on Title VII, the ADEA and ERISA there is federal question jurisdiction under 29 USC 1331.

7. The Court should exercise supplemental jurisdiction under 29 USC 1367 over the claims based on the Illinois Human Rights Act because they are based on the same facts and presents common questions of law.

8. Venue is proper in the Central District of Illinois Rock Island Division because the acts occurred in Rock Island County, Illinois, and Deere & Company (Deere), the Deere Salaried Employee Severance Pay Plan, and Deere as administrator and fiduciary of the Salaried Employees Severance Plan are located in Rock Island County.

## COMMON ALLEGATIONS

9. Tauseef Ahmed resides in Scott County, Iowa.

10. Mr. Ahmed is a former Deere employee whose last position was Group Product Manager Manufacturing Data Platform & Analytics in the Intelligent Solutions Group.  Mr. Ahmed's employment ended on April 23, 2025 after nearly 25 years of service to Deere.

11. Anthony Catalfano resides in Scott County, Iowa.

12. Mr. Catalfano is also a former Deere employee.  His last position was Senior Software Engineer in the IT Group and he worked for Deere for more than 28 years.

13. Mr. Catalfano's employment ended in January 2026.

14. Deere manufactures equipment for agriculture, construction, forestry, and lawncare.

15. Deere employs more than 73,000 people globally including approximately 27,000 in the United States.

16. Deere's corporate headquarters is in Moline, Illinois.

17. Deere is a Delaware Corporation.

18. Deere had over $45 billion in income in its most recent fiscal year which ended October 31, 2025.

19. Deere's net income for its most recent fiscal year was $1.065 billion.

20. Deere has awarded bonuses including performance-based company stock units to executives and members of the board of directors on an ongoing basis since 2024 and before, including $25 million in performance-based stock units to CEO John May in March 2026. These performance-based company stock units are scheduled to vest over time, based on the company meeting certain financial goals.

21. These financial goals are being achieved in significant part by reducing the Deere salaried workforce and not paying severance benefits as set forth in the Deere Severance Pay Plan for Salaried Employees.

22. Since 2022 Deere has had an ongoing reduction in its number of employees in the United States, with intermittent reductions since 2015.

23. From 2024 to the present, Deere reduced its US non-production employee workforce by at least 900 positions. This included a Reduction in Force in the summer of 2024 of nearly 500 salaried employees in Iowa and Illinois, who lost their employment as a result of Deere's elimination of their positions.

24. In the summer of 2024 Deere sponsored a Severance Pay Plan for Salaried employees that provided severance pay benefits to the affected salaried employees of basic salary payments for up to 12 months based on the employee's years of service to the company.

25. Specifically, under the Deere Severance Pay Plan, in 2024 Deere paid to each of the affected salaried employees one-half month's pay for each year of service up to a maximum of 12 months' pay.

26. Deere paid $157 million in employee separation expenses from its general fund as of the end of its fiscal year 2024 and predicted it would pay an additional $27 million during 2025.

27. Deere did not report separation pay in its 2025 annual report, however, apparently lumping it in with litigation costs.

28. Deere required employees receiving these severance benefits to sign a release of claims against the company.

29. In addition, Deere provided other benefits under its Severance Pay Plan, including prorated portions of various bonus compensation, stock options, bridge period of various benefits including health insurance to retirement dates for those eligible, job search assistance, mental health counseling and a list of resources for information related to various benefits.

30. Some details of the Deere Severance Pay Plan's benefits are listed in Exhibit 1, which was distributed among employees/beneficiaries and participants and is obviously a written document. Exhibit 1 is entitled "John Deere Separation Program Frequently Asked Questions (FAQ) July 2024-U.S. Version." Plaintiff expects that documents obtained in discovery will likely include other relevant information.

31. While Exhibit 1 contains a "confidential" designation, it was widely circulated to more than 1,000 employees and Deere made public statements and reports to its effect, including to local media and in its SEC filings.

32. Under the Deere Severance Pay Plan for Salaried Employees in 2024 Deere paid the same service-based benefits to all employees who lost their jobs through position elimination, including employees who had recently received a Performance Needs Improvement or Unsatisfactory Performance.

33. Since the summer 2024 Reduction in Force, and as recently as March 2026, Defendants have continued to offer/provide severance benefits in accordance with the Deere Severance Pay Plan for Salaried employees to some employees whose positions have been eliminated.

34. Deere has maintained administration of its Severance Pay Plan since the summer of 2024 but it has not distributed the benefits equally according to the requirements of ERISA.

35. The Deere Severance Pay Plan requires ongoing administration including these areas:

   a. to deliver benefits equitably and legally;

   b.  obtain legal release agreements from employees that comply with various state laws;

   c. monitor and apply Deere's policies regarding rehire and/or working for contractors and affiliates, which vary among divisions and whether the employee is "retirement eligible";

d. determining whether the separated employees are eligible for tuition reimbursement;

e. managing the "bridge to retirement" for retirement eligible employees;

f. monitoring separated employee compliance with the no solicitation provisions included in the release agreement;

g. monitoring eligibility and delivery of outplacement services, available for 12 months and EAP services, available for 6 months;

h. monitoring compliance with the "no-solicitation" clauses included in the required separation agreement and releases;

36. The 2024 "separation payments," also known as severance payment benefits, stem from an ongoing restructuring and streamlining of the company that started in 2020 and continues to the present. The effort to reduce employee headcount is not a one-time occurrence.

37. Deere's Severance Pay Plan for Salaried Employees is an employee benefit plan and is governed as a welfare benefits plan by *Employment Retirement Income Security Act*, 29 USC 1001 *et seq*. (ERISA).

38. Deere & Company is the plan sponsor and plan administrator of the Severance Pay Plan for Salaried Employees.

39. Shortly after the summer 2024 Reduction in Force, Deere executives, including Dennis Muszalski, who heads the Intelligent Solutions Group where Mr. Ahmed worked, told employees that additional position eliminations would be implemented and would affect an additional 2 percent of salaried positions.

40. Mr. Muszalski said that additional position elimination would be achieved through "attrition," and "forced attrition."

41. Other executives have made similar statements and aggressively pursued headcount reduction through consolidating positions and employment termination.

42. Deere did not notify its workforce that it was changing its severance plan benefits.

43. More than 210 days have passed since the end of Deere's plan year when these changes were adopted.

44. Despite the written benefit schedule outlined in Exhibit 1, Deere's continued headcount reduction, and Deere's ongoing administration of benefits related to employee separation, Deere claims that it does not have a "formal" severance pay plan.

45. In the last 18-22 months Deere has implemented a policy that limits managers' discretion in giving employees complimentary performance reviews.

46. On information and belief, since about November 2024, upper management at Deere has established required percentages of the workforce that must be placed in lower performance categories, although the percentage may vary among divisions/departments.

47. On information and belief, Deere's changes include a requirement that at least 10% of employees be rated as "Performance Needs Improvement."

48. In addition, in 2025 , Deere revised the performance ratings system, eliminating at least two categories, thereby making it easier to classify employees as underperforming or "needing improvement."

49. Deere made other changes in 2024-2025 to its performance evaluation system, including adding certain metrics that made a lower performance rating almost inevitable if an employee was graded as underperforming in a single category.

50. Since Deere's change in its performance evaluation policy, the number of employees who received a "performance needs improvement" rating has substantially increased.

51. Various Human Resources managers have made statements to the effect that the new ratings system makes it easier to terminate employees.

52. Through Deere's new performance evaluation system, Deere gave numerous long term salaried employees critical performance reviews and  presented them with two options: 1) Accept 3-months' severance pay and termination of employment; or 2) complete a 60-day performance improvement period (EPI), on condition that if the employee failed to meet expectations, employment would be terminated and there would be no severance.

53. Mr. Catalfano and Mr. Ahmed had both earned good performance reviews for many years and were abruptly confronted with critical and negative reviews under Deere's new performance evaluation system.

54. Mr. Catalfano's past performance reviews were positive, consisting of Successful and Highly Successful ratings.  But in  Mr. Catalfano's November 2025 review, Deere gave Mr. Catalfano a rating of Performance Needs Improvement.  This was the first time Mr. Catalfano had received a negative review in 28 years of Deere employment.

55. During his Deere employment, Deere obtained two patents based on Mr. Catalfano's work and provided him with awards recognizing his outstanding work.

56. Mr. Catalfano and others accepted the reduced severance of three months when faced with the possibility of no severance payment at the end of the EPI period, and were required to sign a release of claims that was drafted by Deere as a condition of receiving the reduced severance payment.

57. Deere did not inform Mr. Catalfano, Mr. Ahmed and others similarly situated of their continued rights under the Salaried Employee Severance Pay Plan at the time Deere presented them with the 3-month severance pay or potential termination options.

58. The release and other termination document process did not allow for input or modifications by employees.

59. In Mr. Catalfano's case and for other long term employees, the 3-month severance payment and other severance benefits provided by Deere were substantially less than what Deere's Severance Pay Plan would have provided if it had been followed.

60. Deere offered Mr. Catalfano 3 months severance pay. If Deere had followed the Severance Pay Plan, it would have offered him 12 months' severance pay.

61. Mr. Catalfano was not represented by an attorney at the time he was presented with the release and 3-month severance offer.

62. Mr. Catalfano appealed Defendants' refusal to provide him with 12-months of separation pay/severance benefits but as of the filing of this Complaint, Deere has not responded to his appeal.

63. In the alternative, Mr. Catalfano's appeal is futile because Deere claims its Severance Pay Plan does not exist.

64. Moreover, Deere engaged in misconduct in connection with the terminations and its failure to follow its Severance Pay Plan because it deliberately refused to disclose employee/participant rights under the Plan in an effort to save money through its multi-employee reduction in force.

65. Deere's implementation of a policy limiting successful performance reviews, requiring a certain percentage of negative reviews, and forcing employees to choose between accepting reduced severance benefits or face termination without severance benefits are actions designed to save the company money by avoiding the company's responsibilities under its ERISA employee benefits plan.

66. Releases signed by employees who accepted the reduced severance benefits should be voided to enable the employees to collect the severance benefits owed to them under Deere's Severance Pay Plan for Salaried Employees.

67. As plan administrator for its employee benefit plans, Deere's refusal to pay severance to Mr. Ahmed, Mr. Catalfano and others in accordance with its employee benefit plan as set forth in its Severance Pay Plan violates ERISA.

68. ERISA requires that plan administrators act solely in the best interests of plan participants and beneficiaries.

69. Deere's calculated efforts to avoid paying severance to employees who qualify for it under its Severance Pay Plan violate its fiduciary duties. Those calculated efforts include:

   a. Failing to notify employees of their rights under the Plan;

   b. Failing to give notice that it intended to reduce Plan benefits or had reduced Plan benefits;

   c. Misrepresenting severance benefit rights;

   d. Falsely evaluating employee performance in an effort to disqualify employees from the severance benefits to which they were entitled under the Plan;

   e. Increasing executive compensation while depriving lower-level employees of the severance benefits to which they were entitled through false pretenses.

70. Mr. Ahmed's national origin is Pakistani; he is of Asian race and a Muslim.

71. In the Spring of 2023, Mr. Ahmed applied for the position of Group Product Manager Manufacturing, Data Platform & Analytics. This was a promotion from his previous position.

72. At the time, Deere strongly promoted Diversity, Equity and Inclusion (DEI) by, among other things, by tying compensation levels to selection of minority employees and requiring that job opening selection panels include at least one diverse member. In the Spring of 2023, the Intelligent Solutions Group was headed by a person whose national origin was Indian.

73. After Deere selected Mr. Ahmed for the position, from May 2023 to April 2025 he reported to Casey Kann. Dennis Muszalski became Mr. Kann's boss in June 2024.

74. Mr. Ahmed's primary focus as Group Product Manager Manufacturing Data Platform & Analytics was to lead a team of employees in analyzing data to determine efficiencies in inventory management to reduce the cost of carrying

machine and parts inventory, taking into account logistics complications, tariffs, sourcing and sales in the current farm economy.

75. Prior to reporting to Casey Kann, Mr. Ahmed mostly received "Highly Successful" performance ratings.

76. Mr. Kann prioritizes social outings for his team.  Prior to attending his first team social, Mr. Ahmed informed Mr. Kann that while he would attend, he does not drink alcohol.

77. Mr. Ahmed's Islamic religion forbids consumption of alcohol and considers intoxication shameful.

78. When Mr. Ahmed attended these outings he witnessed consumption of copious amounts of alcohol.  Mr. Kann's behavior at these events included slapping employees on the back, loud and slurred joke and dirty storytelling and use of vulgarities and four-letter words.

79. At one gathering in a hotel bar in Frankfurt, Germany Mr. Kann demanded to know how many people each of his managers had fired.   Some team members responded with laughter, but the heavy drinking and crude behavior made Mr. Ahmed uncomfortable.  Mr. Kann instructed Mr. Ahmed to "loosen up and use some swear words."

80. One of Mr. Ahmed's colleagues advised him to "watch out; you're not his (Mr. Kann's) favorite."

81. Mr. Kann employed a crude and cruel style of evaluating the work of some employees. Shortly after Mr. Ahmed had been placed on the Data Analytics team,

he witnessed Mr. Kann yelling, insulting and swearing at factory manager whose national origin is Indian.   On another occasion, Mr. Kann shouted at and insulted an Indian woman during her presentation.   Mr. Ahmed received similar treatment at one of his presentations.  Mr. Kann intimidated, interrupted and talked over people of color and women.  A female manager, who reports to Mr. Kann, was so afraid of his disapproval that she joined a meeting remotely while undergoing a medical procedure.

82. Mr. Kann minimized and discouraged Mr. Ahmed's participation in projects led by other Deere executives who were people of color.

83. In December 2024, Casey Kann held a closed-door Tactical Workforce Planning meeting with his direct reports in Mannheim, Germany to address budget cuts. There Mr. Kann announced that he needed to cut an additional $2 million from the budget and reduce headcount.  One manager had recently been promoted outside of Mr. Kann's organization, and two others had been placed on the Performance Needs Improvement path to termination.   A manager in attendance commented that if they could identify one more performance-based termination, the goal was in reach.

84. For his 2023 review, Mr. Kann rated Mr. Ahmed as "Learning," per company policy at that time because Mr. Ahmed had been in the position for less than one year.

85. In late 2024, however, Mr. Kann rated Mr. Ahmed "Performance Needs Improvement," for both business and people management.   This was the first negative performance review Mr. Ahmed had received in 24+ years of service to Deere.

86. The Performance Needs Improvement rating triggered the option presented to Mr. Ahmed that he either accept three months' severance and leave the company or undergo a 60-day performance monitoring period (EPI) and would be allowed to remain employed if he passed muster.

87. When Mr. Ahmed challenged Mr. Kann on his ratings, pointing out that he and his team had saved the company $5.5 million through their data analytics, Mr. Kann backed off and changed Mr. Ahmed's business rating to "Successful."

88. Mr. Kann refused to change Mr. Ahmed's people management rating, leaving it as "Performance Needs Improvement."

89. Mr. Ahmed chose to undergo the 60-day Performance Improvement period, confident that his performance had objectively been very good.

90. Mr. Kann criticized Mr. Ahmed's performance during the 60-day improvement period for failing to schedule meetings with him and other employees during Spring break despite Mr. Ahmed pointing out that Mr. Kann and others had cancelled the meetings because they were planning vacations over Spring Break.

91. Despite Mr. Ahmed's determination and good performance, Deere terminated his employment on April 23, 2025 after nearly 25 years of service to Deere and with no severance.

92. Deere did not replace Mr. Ahmed, instead assigning his duties to a younger, white Christian male employee who already reported to Casey Kann, thereby reducing the employee headcount in Mr. Kann's department.

93. After Deere terminated Mr. Ahmed's employment Mr. Kann's direct reports were six white Christian men and one white Chistian woman.   All were younger than Mr. Ahmed.

94. Mr. Ahmed was age 57 at the time of his termination and he was the oldest person on the team who reported to Casey Kann.

95. Mr. Ahmed appealed Deere's refusal to give him severance benefits to the Plan Administrator on February 28, 2026.  He also requested a copy of the benefit plan.

96. Deere responded on March 11, 2026 that it disagreed that Mr. Ahmed was eligible for severance benefits under the terms of the applicable severance plan and that it would "...respond in accordance with the plan's claims procedures and in compliance with applicable law."

97. Later, on March 24, 2026, Deere represented that it "does not sponsor or maintain a formal severance plan..." and would not be providing a copy of the plan document.

98. As a result of Deere's illegal acts, Mr. Ahmed has suffered damages, including lost wages and benefits, damage to his career, attorney fees, mental anguish and lost severance benefits.

99. The Illinois Human Rights Act, 775 ILCS 5/1-101 et seq., and Title VII of the 1964 Civil Rights Act forbid discrimination in employment based on a person's national origin, race, religion, and age.

100.    Plaintiffs bring this ERISA class pursuant to Fed. R. Civ Proc. 23.

101.    Plaintiffs seek to bring claims on behalf of a class of employees defined as:

    a. Salaried employees stationed in the United States who were selected for termination for alleged poor performance after receiving a Performance Needs Improvement rating after August 1, 2024 and who were not offered the severance benefits based on years of service as described in Exhibit 1.

    b. Subclass 1 includes terminated salaried employees such as Mr. Ahmed who received no severance and did not sign a release of claims.

    c. Subclass 2 includes terminated salaried employees such as Mr. Catalfano who elected to forgo the EPI, believing it would be futile, and who signed a release of claims.

102. Certification of a class of persons who may receive relief as a result of this action is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because:

    a. The class members are so numerous that it is impractical to bring all class members before this Court in individual actions. On information and belief, each subclass consists of more than 40 individuals.

    b. There are questions of law and fact common to the class. Among the common questions are whether Deere had created a severance plan for the benefit of employees who lost their jobs through downsizing but failed to offer it to all salaried employees who were terminated after August 1, 2024. Deere failed to notify its plan participant of changes to the plan and/or that it had adopted a new plan pursuant as required by ERISA, 29 USC 1024. Plaintiffs expect the evidence will show that many long time employees who had

previously earned successful and highly successful performance ratings were downgraded to save the company money by avoiding paying severance benefits.

c.  Inquiries into employees' performance on an individual basis will not be required to adjudicate Plaintiffs' claims.   The focus will be on Deere's modified performance evaluation policy, quotas for low ratings and the resultant abrupt change in the performance rating trends for significant numbers of salaried employees, a series of intentional corporate policies calculated to reduce or avoid paying severance.

d.  The named Plaintiff's claims are typical of those of the class. Each member of the class asserts claims for failure to pay severance in accordance with Deere's Severance Pay Plan.   In addition, the inquiry into whether the releases signed by employees with Subclass 2 should be voided will focus on Deere's actions including refusing to advise employees facing termination of their rights under the severance pay plan, breach of fiduciary duties, the uniform release documents, significant difference between levels of severance offered and required under the severance pay plan, calculated campaign to issue negative performance reviews and disparity in bargaining power.

e.  The named Plaintiffs will fairly and adequately protect the interests of the class and Plaintiffs have retained counsel experienced in matters of this type. Counsel for Plaintiffs have extensive experience in representing employees seeking to recover unpaid compensation.

f. Questions of law and fact common to the members of the class predominate over questions affecting only individual members. As mentioned above, the fact and law issues will focus on Deere's change in policy to downsize its workforce without paying severance, with the enhanced economic benefit going in part to pay executive bonus/incentives.  Thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

g. Testimony and evidence about whether the Severance Pay Plan was an ERISA plan and whether defendants breached their fiduciary duties to the plan participants.

h. Defendants' reasons for failing to pay eligible employees' severance will affect and apply to the claims of all members.  Individual questions will be restricted to damages.

i. If this Court does not certify a class action, it will be impractical for individual class members to pursue relief and may lead to a large number of separate lawsuits, all of which would rely on the same kind of proof and require roughly the same amount of time, unnecessarily burdening the court.

## COUNT 1 CLASS CLAIM --VIOLATIONS OF ERISA

103.    Mr. Ahmed and Mr. Catalfano repeat and incorporate by reference the Common Allegations .

Deere's failure to notify the named plaintiffs and other salaried employees facing termination as a plan participants and/or beneficiaries of  their rights to

severance pay , as set forth in its as set forth in its Severance Pay Plan violates ERISA.

104.   The Deere & Company Severance Pay Plan for Salaried Employees violated ERISA by failing to provide severance benefits in accordance with the Plan to the named plaintiffs and others similarly situated.

105.   Deere as Administrator of the Deere & Company Severance Pay Plan for Salaried Employees breached its fiduciary duty to Mr. Ahmed, Mr. Catalfano and other salaried employees as Plan participants and beneficiaries.

106.   Deere's efforts to deprive Mr. Ahmed, Mr. Catalfano and other salaried employees severance benefits to which they were entitled based on years of service, by re-rigging its performance review system and requiring managers to place a predetermined number of employees in the "performance needs improvement" category in order to avoid paying severance benefits, constitute unlawful interference with the employees' rights to severance benefits.

107.   Deere's refusal to provide severance benefits in accordance with the Plan's schedule based on length of service violates ERISA because it failed to notify the Plan participants there had been any changes in the Plan within 210 days of the end of the Plan's fiscal year when the alleged changes were made.

108.   Deere's failure to provide written Separation Pay Plan documents when requested by a Plan participant, as described herein, violated ERISA, 29 USC 1024(b).

109.   Deere's actions violate 29 USC 1132(a)(1)(B), 29 USC 1132 (a)(2), 29 USC 1140, 29 USC 1132 (c), 29 USC 1001(b), 29 USC 1104(a)(1), 29 USC 1024.

### COUNT II – VIOLATION OF TITLE VII -- INDIVIDIUAL CLAIM

110.    Mr. Ahmed repeats and incorporates by reference the Common Allegations.

111.    Deere discriminated against Mr. Ahmed based on his national origin, race and religion.

112.    Mr. Ahmed filed a charge alleging race, religion and national origin discrimination   on January 30, 2026, exhausting the administrative requirements for bringing this claim.

113.    Mr. Ahmed's Right to Sue letter, which is dated March 11, 2026, is attached to this Complaint as Exhibit 2.

### COUNT III -VIOLATION OF ILLINOIS HUMAN RIGHTS ACT – DISCRIMINATION--INDIVIDIUAL CLAIM

114.    Mr. Ahmed repeats and incorporates by reference the Common Allegations.

115.    Deere discriminated against Mr. Ahmed based on his national origin, age, race and religion.

116.    Mr. Ahmed filed a charge alleging race, age, religion and national origin discrimination on January 30, 2026 exhausting the administrative requirements for bringing this claim.

117.    Mr. Ahmed's Right to Sue letter, which is dated March 11, 2026, is attached to this Complaint as Exhibit 2.

## COUNT IV –VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT--

## INDIVIDIUAL CLAIM

118.    Mr. Ahmed repeats and incorporates by reference the Common Allegations.

119.    The determining factor in Deere's decision to terminate the employment of Mr. Ahmed was his age which violated the Age Discrimination in Employment Act, 29 USC 621 et seq.

## JURY DEMAND

120.    Mr. Ahmed demands a jury trial on his discrimination claims.

## PRAYER FOR RELIEF

In conclusion, Mr. Ahmed, Mr. Catalfano and others similarly situated pray this Court for its order entering judgment against defendants for severance benefits in accordance of Deere's Severance Pay Plan, injunctive relief, attorney fees and costs. Mr. Ahmed prays this Court for its order entering judgment for past and future lost wages and benefits, mental anguish, punitive damages, attorney fees and costs, and for such other relief that justice requires.

Respectfully submitted,

*Dorothy A. O'Brien*
Dorothy A. O'Brien #AT0005877
O'BRIEN & MARQUARD, PLC
2322 East Kimberly Road, Suite 140S
Davenport, IA 52807
563-355-6060  Telephone
563-355-6666  Facsimile
dao@emprights.com  Email
ATTORNEY FOR PLAINTIFFS


*Melissa C. Hasso*
Melissa C. Hasso AT0009833
(*Pro hac vice application to be filed*)
HASSO & WILSON LAW FIRM PLLC
111 E. Grand Ave. Suite 212
Des Moines, IA 50309
Telephone: (515) 224-2079
Facsimile:  (515) 224-2321
E-mail: mhasso@hwlawiowa.com
ATTORNEY FOR PLAINTIFFS