E-FILED
Monday, 02 November, 2026 11:45:10 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| TAUSEEF AHMED and ANTHONY CATALFANO, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 4:26-cv-04114-SLD-RLH |
| DEERE & COMPANY, DEERE & COMPANY AS ADMINISTRATOR OF EMPLOYEE WELFARE BENEFITS PLAN, and DEERE & COMPANY SEVERANCE PAY PLAN FOR SALARIED EMPLOYEES (ALSO KNOWN AS JOHN DEERE SEPARATION PROGRAM), | ) | |
| Defendants. | ) | |

ORDER

This dispute arises out of Defendant Deere & Company's ("Deere") adoption of a severance pay program (the "Severance Program")[1] during layoffs in the summer of 2024. Plaintiffs Tauseef Ahmed and Anthony Catalfano allege that Defendants Deere (corporately and as administrator of an employee welfare benefits plan) and Deere & Company Severance Pay Plan for Salaried Employees violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, when Deere terminated Plaintiffs' employment and failed to notify them of their rights under the Severance Program or provide them with its benefits. Before the Court is Defendants' motion to dismiss Plaintiffs' ERISA claim, ECF No. 23. Defendants argue that the Severance Program does not constitute a "plan" that falls within ERISA's purview; that

[1] Plaintiffs refer to the Severance Program as a "Severance Pay Plan" in their complaint. *See, e.g.*, Am. Compl. 5, ECF No. 19. Since the parties dispute whether the Severance Program qualifies as a "plan" within the meaning of the Employee Retirement Income Security Act, the Court will refer to it as a "program" instead of a "plan" to avoid confusion.

even if it did, Plaintiffs did not meet the eligibility criteria necessary to receive the Severance Program's benefits; that Plaintiffs do not plausibly allege that Defendants breached their fiduciary duties under ERISA; and that neither Plaintiff can bring an ERISA claim because Catalfano has waived his right to bring such claims and Ahmed's ERISA claim is inconsistent with his other claims for relief. Also before the Court is Defendants' motion for leave to file a reply, ECF No. 27, in support of the motion to dismiss. For the reasons that follow, the motion for leave to file a reply is GRANTED and the motion to dismiss is DENIED.

## BACKGROUND[2]

Deere is multi-billion-dollar corporation that manufactures agricultural machinery and other heavy equipment. Plaintiffs are Iowa residents who formerly worked for Deere. Ahmed worked for Deere for nearly twenty-five years, most recently as a product manager, before his employment was terminated on April 23, 2025. Catalfano worked for Deere for over twenty-eight years, most recently as a senior software engineer. His employment ended in January 2026.

Since 2015, Deere has intermittently reduced its workforce. Those efforts have accelerated since 2022. In the summer of 2024, Deere eliminated the positions of nearly 500 salaried employees in Iowa and Illinois, a reduction in force that it termed "Mozart." As part of Mozart, Deere sponsored the Severance Program for salaried employees. Under the Severance Program, Deere would pay up to twelve months of a terminated employee's salary based on their time of service to the company: half a month of pay for each year of service with Deere. The Severance Program provides a number of other benefits in addition to the lump-sum severance

---

[2] Unless otherwise stated, the facts described in this section are as alleged in Plaintiffs' Amended Complaint, ECF No. 19. For the sake of ruling on the motion to dismiss, the Court "accept[s] as true all factual allegations in the . . . complaint and draw[s] all permissible inferences in [Plaintiffs'] favor." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015).

payments. It gives Deere managers the discretion to grant employees unpaid leave for up to thirty days to allow them to apply for an open position with Deere. Eligible employees may also apply to be placed on an unpaid leave of absence in order to bridge to retirement for purposes of attaining pension and retiree medical benefits. To receive the severance payments, employees must continue working in their current position after being notified of the termination—performing to a standard their managers consider satisfactory—until the last day of employment. They must also sign a release of claims, agree to remain bound by Deere's confidentiality agreements, and refrain from soliciting Deere employees, suppliers, or customers for twelve months. Employees terminated under the Severance Program also remain eligible for various other benefits, including stock options, bonus compensation, health insurance, job search assistance, and mental health counseling. During Mozart, all employees who lost their jobs through position elimination received severance payments pursuant to the Severance Program, even if the employee recently received ratings of Performance Needs Improvement or Unsatisfactory Performance in a performance evaluation.

Deere has continued sponsoring the Severance Program since Mozart and has sent several Frequently Asked Questions ("FAQ") sheets to employees discussing the details of the Severance Program. Plaintiffs have provided two of these documents for the Court's consideration: a "John Deere Separation Program" FAQ sheet from July 2024, ECF No. 19-1, and a "Displacement Process for Organizational Reductions" FAQ sheet from October 2024, ECF No. 19-2.

Shortly after Mozart, Deere executives informed employees that additional positions would be eliminated through "attrition" and "forced attrition." Am. Compl. 12, ECF No. 19 (quotation marks omitted). To achieve continued workforce reduction, upper management

established percentages of the workforce that must receive ratings of Performance Needs Improvement or Unsatisfactory Performance in performance evaluations. Deere also revised its performance ratings system, making it easier to classify employees in one of those categories. As a result, the number of employees receiving a Performance Needs Improvement rating has substantially increased. Catalfano and Ahmed had both received good performance reviews for years and unexpectedly received negative reviews during this time.

After implementing this new performance evaluation system, Deere presented employees who received critical performance reviews with two options: (1) receive three months' severance pay and have their employment terminated, or (2) complete a sixty-day performance improvement period, understanding that if the employee failed to meet expectations his employment would be terminated at the end of the sixty-day period with no severance pay. Employees who agreed to leave their employment and receive three months' severance pay were required to sign a release similar to the one employees had to sign to receive payments under the Severance Program.

Deere gave Plaintiffs these two options. Deere did not inform Plaintiffs that they were eligible for severance payments under the Severance Program. Catalfano agreed to accept the termination of his employment, sign the release, and receive three months' severance pay. He was not represented by an attorney when presented with the choice. If receiving payments under the Severance Program, Catalfano would have been eligible to receive twelve months' severance pay. Ahmed chose to enter a sixty-day performance improvement period, at the end of which his employment was terminated for failure to meet expectations. Plaintiffs both contested Deere's refusal to award severance benefits pursuant to the Severance Program. Deere did not respond to Catalfano; it told Ahmed that it did not sponsor a formal severance plan.

Ahmed also brings allegations to the effect that his employment was terminated because of his race, age, religion, and/or national origin. Ahmed is a Muslim of Asian race whose national origin is Pakistani. At the time he was fired, he was fifty-seven years old and was the oldest member of his team.

In their Amended Complaint, now the operative complaint, Plaintiffs bring Count I for violations of ERISA, alleging that Defendants breached their fiduciary duties and failed to provide severance benefits in accordance with the Severance Program. Ahmed also brings Counts II, III, and IV for employment discrimination, alleging that Deere wrongfully terminated his employment on the basis of race, age, religion, and/or national origin.

Defendants now move to dismiss Count I. Plaintiffs filed a response, ECF No. 26, opposing the motion to dismiss in its entirety, and Defendants sought leave to reply.

## DISCUSSION

### I. Motion for Leave to Reply

"A reply to the response is only permitted with leave of Court." Civil LR 7.1(B)(3). A reply may be permitted because of "the non-movant's introduction of new and unexpected issues in his response," and in the interest of completeness. *Magnuson v. Exelon Corp.*, 658 F. Supp. 3d 652, 658 (C.D. Ill. 2023) (quotation marks and alteration omitted). However, "the Court does not typically permit the moving party to file a reply in order to introduce new arguments or evidence that could have been included in the motion itself, or to rehash the arguments made in the motion." *Shefts v. Petrakis*, No. 10-cv-1104, 2011 WL 5930469, at *8 (C.D. Ill. Nov. 29, 2011). Defendants identify several reasons for their reply, including: Plaintiffs' mischaracterization of the facts and law, Plaintiffs' reliance on inapposite case law, and Plaintiffs' inclusion of an improper exhibit. Mot. Leave Reply 2. To address the reasonably

unexpected exhibit and in the interest of completeness, the motion for leave to reply is GRANTED.

## II. Motion to Dismiss

### a. Legal Standard

A court will dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To determine whether it states a claim, a court considers whether a complaint's "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. A court conducting this review must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012). However, a court does not accept a complaint's legal conclusions. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013).

### b. Analysis

ERISA's civil enforcement provision allows that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a). It also permits "a participant, beneficiary, or fiduciary" to bring an action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "to obtain other appropriate equitable relief." *Id.* § 1132(a)(3). This

latter provision allows individuals to receive equitable relief for breaches of fiduciary duty. *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 992 (7th Cir. 1993).[3]

Defendants argue both that the Severance Program does not qualify as a "plan" for purposes of ERISA and that, even if it did, Plaintiffs were not participants or beneficiaries of the plan. Mem. Supp. Mot. Dismiss 6–13, ECF No. 24. They further contend that even if Plaintiffs do state a claim for a violation of ERISA, any claim for a breach of fiduciary duty should be dismissed because there are no allegations to support it. *Id.* at 13. Finally, Defendants insist that Catalfano's claims must be dismissed because he released any claims against Defendants when he signed the separation agreement. *Id.* at 13–15. The Court considers each argument in turn.[4]

**i. ERISA "Plan"**

ERISA defines "plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3). The terms "employee welfare benefit plan" and "employee pension benefit plan" are in turn defined as "any plan, fund, or program" established by an employer or employee organization for the purpose of providing welfare benefits or retirement income, respectively. *Id.* § 1002(1), (2)(A). Because the definitions all refer back to the word

---

[3] Another section of the statute, 29 U.S.C. § 1132(a)(2), provides a specific cause of action for breach of fiduciary duty. The Supreme Court held in *Massachusetts Mutual Life Insurance Company v. Russell*, 473 U.S. 134 (1985), that any recovery for a breach of fiduciary duty under § 1132(a)(2) "runs to the plan and not beneficiaries as individuals." *Anweiler*, 3 F.3d at 992. However, "an individual may seek equitable relief from a breach of fiduciary duty under section 1132(a)(3)." *Id.* at 993. Accordingly, individuals such as Plaintiffs may bring equitable actions for breach of fiduciary duty under § 1132(a)(3).

[4] Defendants also state that "Count I is logically inconsistent with other claims, as the relief that . . . Ahmed seeks in Count I would necessarily release the individual claims he has brought in Counts II, III, and IV." Mem. Supp. Mot. Dismiss 2. Defendants do not further argue why this merits dismissal or cite any legal authority in support of their claim. *See generally*, *id.* Thus, the argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

"plan," the term's meaning cannot be ascertained by reference only to the language of the statute. *Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1374 (7th Cir. 1997)

The seminal case defining the bounds of a "plan" under ERISA is *Fort Halifax Packing Company v. Coyne*, 482 U.S. 1 (1987). In that case, the Supreme Court considered whether ERISA pre-empted a Maine statute requiring employers operating certain production and packing plants to pay a one-time severance payment to employees in the event of a plant closing. *Id.* at 3–4. It held that the Maine statute does not create or require employers to create an employee welfare benefit "plan" within the meaning of ERISA. *Id.* at 6. The Court reasoned that a "plan" requires "an ongoing administrative program for processing claims and paying benefits." *Id.* at 12.

Subsequently, courts have struggled to discern when the obligations of a severance program require an employer to establish an ongoing administrative scheme. There is one clear rule that has emerged: the mere need to arithmetically compute the amount of each claimants' severance benefits is not the sort of ongoing administrative scheme contemplated in *Fort Halifax*. *See Cvelbar*, 106 F.3d at 1375 ("Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme . . . ." (quotation marks omitted))." Beyond that clear rule, courts have turned to a variety of different considerations (with the particular articulation and emphasis dependent on the facts of the case) to determine whether the implementation of a severance program demands an ongoing administrative scheme and is, consequently, a "plan" under ERISA.

Initially, a severance program is more likely an ERISA plan if the severance payments are continuous, as opposed to one-time. *See Cvelbar*, 106 F.3d at 1377 (finding the existence of a "plan" where, over the course of a three-year period, the employer had to process medical

claims, pay medical benefits, and make a monthly payment); *Atkins v. CB&I, L.L.C.*, 991 F.3d 667, 670 (5th Cir. 2021) ("Multiple payments, payments varying in amounts, and payments made on an irregular basis are more indicative of ERISA-governed plans."). A program is also more likely an ERISA plan if it imposes long-term obligations on the employer. *Fort Halifax*, 482 U.S. at 12 (finding relevant that, under the Maine statute, "[t]he employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control"). While these criteria overlap substantially, the Court understands them as addressing, on the one hand, whether a single employee receives his severance payment in a lump sum or in installments and, on the other, whether the severance program as a whole anticipates the employer paying benefits during only a discrete period or over an extended period of time. Relatedly, a program is more likely an ERISA plan if the obligation to make severance payments is triggered by numerous disparate occurrences instead of a single event. *See id.* (reasoning that the Maine statute requiring severance payments upon a plant closure was not a "plan" because "the employer's obligation is predicated on the occurrence of a single contingency that may never materialize"); *Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir. 1998) (finding the existence of a "plan" where, in contrast to the one-time obligation arising out of a plant closure in *Fort Halifax*, an employer was exposed to the possibility "of multiple payments to various managers, at different times and under different circumstances").

Next, an ERISA plan more likely requires an individualized, case-by-case review to determine the appropriate severance payment. *See Cvelbar*, 106 F.3d at 1375 ("[A]n employer's need to create an administrative system may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular

circumstances in light of the appropriate criteria." (quotation marks omitted)); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 935 (8th Cir. 1999) (reasoning that a severance program was a "plan" because "the decision to pay benefits [was] made on an individual, ongoing basis . . ."). Finally, a program is more likely an ERISA plan if it involves the exercise of managerial discretion. *See Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 631–32 (7th Cir. 2001) (holding that a severance program was a "plan" because, *inter alia*, it "was not capable of a mechanical application, but required the exercise of discretion"); *Collins*, 147 F.3d at 595–97 (finding that an employer would need an administrative program to operate a severance program in which, to determine a claimant's eligibility, it had to assess a claimant's new job duties, compare them to previous responsibilities, and determine whether the difference between the two was "substantial"). No one factor is determinative. *Emmenegger*, 197 F.3d at 935.

Plaintiffs' complaint alleges facts that would make the Severance Program a "plan" within the meaning of ERISA. First, the Severance Program imposes long-term obligations on Defendants as they have to pay out varying amounts of money to retiring employees indeterminately into the future—one payout to each employee who is fired for qualifying reasons, which include reorganization or restructuring, job elimination, job combination, and workload reduction. Displacement Process FAQ 1. Second, the obligation to make payments arises any time an employee is fired for one of those reasons, meaning Defendants' obligation is triggered by many events, which—though of the same type (termination of an employee)—repeat regularly and with an unpredictable frequency. Third, implementation of the Severance Program requires case-by-case review. Defendants have to, *inter alia*, determine eligibility for year-end bonuses, Separation Program FAQ 4, assess whether a terminated employee is eligible to bridge to retirement, *id.* at 1, and track which employees sign the release for the purpose of

enforcing the non-solicitation provision, *id.* They also have to monitor whether an employee placed into the Severance Program "[r]emain[s] in their current position and fulfill[s] their duties satisfactorily (subject to the discretion of their manager(s)) until their last day of active work." *Id.* Finally, the Severance Program also gives managers substantial discretion. Deere management has to determine the reason for employees' terminations, *id.*, whether employees continue to fulfill their duties "satisfactorily," *id.*, and whether to grant employees unpaid leaves of absence during which they can apply for a new position with Deere, Am. Compl. 6. Against this backdrop, it is not dispositive that the payments themselves are made only once to each employee and can be determined by an arithmetical calculation. It is likely that Defendants need an ongoing administrative scheme to administer the Severance Program.

Deere's Severance Program is similar to the program in *Collins*, which the Seventh Circuit found to qualify as a plan for purposes of ERISA. *Collins*, 147 F.3d at 597. In that case, an employer executed retention agreements wherein it agreed to pay six months' salary and a year of associated benefits to upper-level managers if they were terminated after the company was acquired by a prospective buyer, or if they were constructively terminated by virtue of their job responsibilities being substantially reduced. *Id.* at 594. The court reasoned that this agreement was an ERISA plan because the managers had a full year to demand payouts—creating an extended period of potential financial liability—and the employer had to exercise discretion in determining whether a manager's job responsibilities were substantially reduced. *Id.* at 595–96. Deere's obligations are similar. Its potential liabilities extend into perpetuity since newly terminated employees are continually added to the Severance Program. And Deere exercises a similar level of discretion, as it must determine the reason for an employee's termination, the employee's eligibility for a leave of absence, and whether the employee

continues to perform satisfactorily. Separation Program FAQ 1; Am. Compl. 6. As in *Collins*, "[i]t is unreasonable to conclude that [Deere] could face such potential protracted liability without the advantage of an ongoing administrative scheme to satisfy its obligations." *Collins*, 147 F.3d at 597. Like in that case, only an ongoing administrative scheme would allow Deere to perform these tasks regularly and consistently.

The Severance Program is also similar to the program that the Eighth Circuit held was an ERISA plan in *Emmenegger*, 197 F.3d at 935. In that program, the employer made lump-sum severance payments to employees who were terminated for non-disciplinary reasons and who gave the employer "excellent service during their employment." *Id.* at 934. The court held that the severance program was an ERISA Plan because "no single event triggers a one-time payment of benefits to all participants" (which consequently created "a continuing, albeit possibly sporadic, need for processing requests for benefits and making payments") and because the employer had to make judgments about "both the reason for the discharge and the history of the employee's service." *Id.* at 935. Similarly in this case, there is no single triggering event, but a continuous need for Deere to process severance payments for only those employees whom it determined were terminated due to organizational changes and evolving business needs. Management also had to determine eligibility for an unpaid leave of absence and future end-of-year bonuses and assess whether the employees performed satisfactorily until the last day of work. Considering these provisions together, here, like in *Emmenegger*, "the decision to pay benefits is made on an individual, ongoing basis, after exercising the discretion described in the [Severance Program]." *Id.*

Defendants cite several cases in which a severance program was not an ERISA plan, but all of them are distinguishable. First, in *Hoffman v. United Airlines, Inc.*, No. 21-cv-06395, 2025

WL 1262504, at *1–2 (N.D. Ill. May 1, 2025), the court considered a policy wherein United Airlines ("United") would provide retirement benefits to employees who had retired in good standing if an "early out" program was enacted within three years of their retirement. The court held that the policy was not an ERISA plan because, first, the benefits were contingent on United offering an "early out" program—"'a contingency that may never materialize.'" *Id.* at *5 (quoting *Fort Halifax*, 482 U.S. at 12). In fact, when informing employees about the policy, United "emphasized the uncertainty of such payments ever being made." *Id.* Additionally, the application of the policy was "mechanical" since it merely provided the benefits of an "early out" program to employees in good standing, with eligibility determined by a simple formula that considered the employees' age and their years of service. *Id.*

*Coveny v. Cablevision Lightpath, LLC*, No. 25-CV-1214-SJB-JMW, 2026 WL 787880, at *1 (E.D.N.Y. Mar. 20, 2026), involved an employer that launched a program to make one-time lump-sum payments to employees as an incentive for retiring early. An employee had to, among other things, be in good standing to be eligible, but the payment itself depended only on the length of the employee's tenure with the company. *Id.* The court held that the program was not an ERISA plan because it "required little managerial discretion," could not be reasonably perceived as "an ongoing commitment . . . to provide benefits," and did not require individualized analysis beyond simple arithmetical calculations. *Id.* at *4–5.

The Fifth Circuit in *Atkins*, 991 F.3d at 668–69, considered a project incentive wherein an employer would pay the equivalent of five percent of an employee's total earnings for employees who remained on a project until its completion. Employees who the employer transferred to another project or who were laid off in a reduction of force were also eligible for the bonus. *Id.* The court held that the incentive was not an ERISA plan because it involved a one-time,

arithmetical payment to each employee, the one-time payment was the only component of the incentive, and the only discretion that the employer exercised was determining whether a worker was laid off in a reduction of force. *Id.* at 670–71.

Finally, *Bowser v. Gabrys*, 746 F. Supp. 3d 256, 260 (W.D.N.C. 2024), involved an employer's "Terminal Leave Pay" policy wherein eligible employees received a one-time payment of two days' pay per full year of employment when they permanently retired from the workforce. Employees were eligible if they worked exclusively in certain units, had worked for the employer for at least ten years, were above the age minimum, and were not fired for cause. *Id.* The court held that the policy was not an ERISA plan because it involved one-time payments and did not require employer discretion as the determination of whether a termination was "for cause" did not involve a meaningful amount of discretion. *Id.* at 263–64.

What these cases have in common is the proposition that a severance program is not an ERISA plan merely because it requires employers to determine whether an employee was in good standing or was fired for cause, or because the obligation to pay is triggered each time an employee is fired or retires. *See Coveny*, 2026 WL 787880, at *4; *Hoffman*, 2025 WL 1262504, at *5; *Bowser*, 746 F. Supp. 3d at 264; *Atkins*, 991 F.3d at 671.

But there are several ways Deere's Severance Program has a greater need for an ongoing administrative program than those in the cases Defendants cite. First, Deere's payment obligation under the Severance Program arises more frequently than the employers' obligations in *Hoffman*, *Coveny*, and *Atkins*. The obligation in *Hoffman* only arose when United offered an "early out" program, *Hoffman*, 2025 WL 1262504, at *1–2, while the programs in *Coveny* and *Atkins* were limited to an eight-month period and a single construction project, respectively, *Coveny*, 2026 WL 787880, at *1; *Atkins*, 991 F.3d at 670. Deere's obligation arises any time an

employee is let go for qualifying reasons and continues indefinitely. Separation Program FAQ 1. Second, none of the programs in the cases Defendants cite entail managerial discretion akin to Deere manager's discretion in deciding whether an employee has performed "satisfactorily," *id.*, and whether an employee should receive an unpaid leave of absence to apply for a new job with Deere. Am. Compl. 6. Further, there is no indication that employees subject to the programs in *Hoffman*, *Coveny*, *Atkins*, or *Bowser* had to sign a release or non-solicitation clause with respect to which the employer would have to track adherence. Deere employees did. Separation Program FAQ 1, 3. Finally, the Severance Program interacts with other benefits programs in ways that cannot reasonably be administered without an ongoing administrative program. *See, e.g.*, *id.* at 5 (noting that an employee under the Separation Program will receive "an LTIC pro-rated equivalent award" even if the employee is not otherwise eligible for such a payment).

In conclusion, based on the allegations in the complaint, the Severance Program is an ERISA plan. The regularity of Deere's obligation to pay, the discretion its managers hold, and the need to track employees' leave status and compliance with the release suggest, when considered together, that Defendants need an administrative program to administer the Severance Program.

**ii. Plaintiffs' Eligibility**

Defendants next argue that Plaintiffs cannot bring an ERISA claim because they do not allege that they were "participants" in the Severance Program. Mem. Supp. Mot. Dismiss 11–13. The FAQs that Plaintiffs attach to their complaint state that the Severance Program was used for employee separations "due to organizational changes and evolving business needs." Separation Program FAQ 1. Elaborating on these criteria, the Displacement Process FAQ states that the Severance Program is used in four instances: reorganization/restructuring, job elimination, job

combination, and workload reduction (such as the elimination of a shift). Displacement Process FAQ 1. To actually receive the severance payments, eligible employees must remain in their position until their last day of work and sign a separation agreement that includes a release of claims. *Id.*

Under ERISA, generally only participants, beneficiaries, and fiduciaries can bring a civil action to recover benefits or enforce rights under a plan. 29 U.S.C. § 1132(a)(1)–(3). A "participant" is defined as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan . . . ." *Id.* § 1002(7). In addition to employees who are actually eligible for participation in a benefits plan, "persons who have . . . a 'colorable claim to vested benefits' also have standing to bring ERISA claims." *Kamler v. H/N Telecomm. Servs., Inc.*, 305 F.3d 672, 678 (7th Cir. 2002). A plaintiff has a "colorable claim" if he has a "nonfrivolous claim for the benefit in question." *Id.* Eligibility to receive a benefit from a plan is determined by reference to the terms of the plan itself. *Est. of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 571 (7th Cir. 2009) ("A plaintiff must . . . demonstrate that he was eligible under the terms of the employer's own benefit plans.").

ERISA's use of the term "participant" also shows that the term includes those who are made facially ineligible by virtue of a pretextual termination. The statute contains a specific provision making it unlawful for an employer "to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. An employer may be liable under this provision if it terminates an employee for the true—though hidden—purpose of interfering with his rights under ERISA. *See Salus v. GTE*

*Directories Serv. Corp.*, 104 F.3d 131, 136 (7th Cir. 1997) (stating that evidence "that the proffered explanation for [the employee's] termination was pretextual" supports a finding of unlawful interference). Since, under that statute, an employer is only liable for interference with the rights of "a participant or beneficiary," 29 U.S.C. § 1140, a rule that a pretextual termination could make an employee no longer a "participant" would gut the statute and make the rights it purports to protect effectively unattainable.[5]

Plaintiffs claim that Deere has been actively reducing its work force since 2022. Am. Compl. 4. As part of this effort, Deere eliminated the positions of nearly 500 salaried employees in Iowa and Illinois in summer of 2024. *Id.* at 4–5. Shortly thereafter, Deere executives told employees that additional positions would be eliminated, including through "attrition" and "forced attrition." *Id.* at 12 (quotation marks omitted). Pursuant to this policy, Deere aggressively pursued workforce reduction by consolidating positions and terminating employees. *Id.* In November 2024, management imposed a requirement that at least 10% of employees must be rated as "performance needs improvement" during performance evaluations. *Id.* at 13. Deere also altered its performance evaluation system to make it easier for employees to receive a "performance needs improvement" rating. *Id.* As a result, the number of employees receiving such a rating has substantially increased. *Id.* It was pursuant to this new policy that Plaintiffs received a negative performance evaluation and were presented with the choice of accepting three months' severance pay and signing a release or completing a performance improvement period and risking termination with no severance. *Id.* at 13–14.

Drawing all inferences in Plaintiff's favor, as the Court must at this stage, these allegations suggest that Defendants pretextually created the performance improvement plan and

---

[5] Plaintiffs specifically state that Deere is liable under 29 U.S.C. § 1140. Am. Compl. 26. This alone would prevent dismissal on grounds that the nature of Plaintiffs' termination precludes their recovery under ERISA.

forced poor performance reviews so that they could reduce Deere's workforce. In that context, it is evident that Plaintiffs plead that they are "participants" within the meaning of ERISA. Deere fired Plaintiffs in bad faith for the purpose of preventing them from receiving the benefits of the Severance Program. Thus, although Plaintiffs were facially terminated (or compelled to resign) due to their poor performance, they plausibly allege that the true reason they ended employment with Deere was job elimination and Deere's business needs. If true, Plaintiffs were eligible for participation in the Severance Program because they were, in fact, fired due to job elimination, workload reduction, or reorganization. Any other purported reason for their termination was pretextual and certainly cannot justify dismissal.

**iii. Breach of Fiduciary Duty**

"In order to state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quotation marks omitted). Defendants contest only the second element, arguing that Plaintiffs do not allege that any Defendant breached any fiduciary duty. Mem. Supp. Mot. Dismiss 13.[6]

ERISA imposes a duty on each plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). "Fiduciaries breach their duties of loyalty and care if they mislead plan participants or misrepresent the terms or administration of a

[6] Defendants do not distinguish between their respective fiduciary duties. *See* Mem. Supp. Mot. Dismiss 13. Since the parties treat Defendants identically, the Court need not address at this stage whether Plaintiffs allege a distinct breach of fiduciary duty by each Defendant.

plan. Fiduciaries must also communicate material facts affecting the interests of beneficiaries." *Anweiler*, 3 F.3d at 991 (citation omitted). While fiduciaries do not breach their duties every time they miscommunicate information about the plan, "fiduciaries must communicate material facts affecting the interests of plan participants or beneficiaries." *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000). "[T]his duty to communicate exists when a participant or beneficiary asks fiduciaries for information, and even when he or she does not." *Id.* (quotation marks omitted).

Plaintiffs clearly state a claim for breach of fiduciary duty. They allege that Deere farcically changed its evaluation policy to force well-performing employees out of the company in order to avoid paying the severance benefits required by the Severance Program. Of course, to achieve the purpose of this scheme, Defendants did not inform Plaintiffs of their rights under the Severance Program. Such misconduct would be a blatant violation of the duty to communicate information regarding a plan and refrain from misrepresenting its terms.

Defendants argue that this claim must still be dismissed because it is duplicative of Plaintiffs' claim for the denial of benefits. Mem. Supp. Mot. Dismiss 13. It is true that "a denial of benefits, without more, does not constitute a breach of fiduciary duty . . . ." *Sumpter v. Metro. Life Ins.*, 683 F. App'x 519, 521 (7th Cir. 2017). However, misconduct surrounding the denial of benefits may constitute a breach of fiduciary duty. *See id.* (suggesting that the failure to alert a beneficiary about the elimination of a benefit or hindering the claims process could constitute a breach of fiduciary duty, though the evidence in that case was insufficient to advance such a theory of liability). In this case, Plaintiffs allege more than a bare denial of benefits. The misconduct surrounding the denial of severance pay—failure to inform Plaintiffs of their rights and pretextual employment practices designed to avoid the obligation to pay the benefits of the

Severance Program—is enough to elevate the breach of fiduciary duty claim beyond the mere denial of benefits.

**iv. Release of Claims**

Finally, Defendants argue that "Catalfano's claims should be dismissed because he executed a release of claims against Defendants." Mem. Supp. Mot. Dismiss 13. Catalfano signed a release of claims as a condition of receiving three months' severance pay when his employment was terminated. Am. Compl. 14–15. Plaintiffs do not contest this fact but instead contend that dismissal is inappropriate because the complaint alleges facts making it plausible that the release is not valid. Resp. Mot. Dismiss 11–13. Anticipating this, Defendants respond that, even if the release was not valid, Catalfano cannot challenge the validity of the release unless he first repays the severance payment he received as consideration for signing the release. Mem. Supp. Mot. Dismiss 14–15. The Court first addresses the validity of the release before turning to the tender-back requirement.

The validity of a release depends on "the totality of the circumstances," including:

> (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract law; and (8) whether the employee's release was induced by improper conduct on the defendant's part.

*Hampton v. Ford Motor Co.*, 561 F.3d 709, 716–17 (7th Cir. 2009) (quotation marks omitted).

Based on the facts alleged, it is plausible that the release is invalid. At least half of the factors weigh in favor of invalidating the release. Catalfano did not appear to have any input in negotiating the terms of the release, and he was not represented by counsel when he signed it.

Am. Compl. 14–15. Assuming the complaint is correct that Deere pretextually terminated Catalfano's employment and refused to inform him of his rights to a greater severance payment under the terms of the Severance Program, the seventh and eighth factors also weigh against enforcing the release. The complaint says nothing about most of the other factors. It does not reveal how long Catalfano had to deliberate before signing the release, whether he actually read the release before signing it, or the nature of his education and experience with contracts. The Court cannot, on these facts, say that the release must be enforced.

The complaint also plausibly alleges that Catalfano need not repay the three months' severance payment before challenging the validity of the release. "The principle that a release can be rescinded only upon a tender of any consideration received . . . is a general principle of contract law." *Fleming v. U.S. Postal Serv. AMF O'Hare*, 27 F.3d 259, 260 (7th Cir. 1994); *Hampton*, 561 F.3d at 717. However, there is an exception to the tender requirement when the party seeking recission did not receive adequate consideration for signing the release. *Lawson v. J.C. Penny Corp.*, 580 F. App'x 492, 494 (7th Cir. 2014); *see also Fleming*, 27 F.3d at 261 ("Unproblematic for excusing tender, however, is the case in which all the plaintiff obtained in exchange for the release was something to which he was already entitled, as distinct from obtaining payment of a disputed or disputable claim."). If Plaintiffs' allegations are proven true, then Catalfano was entitled to twelve months' severance pay. Am. Compl. 15. He received only a quarter of that when he signed the release. *Id.* Since, under the facts alleged in the complaint, Catalfano was already entitled to the three months' severance pay he received, the release fails for lack of consideration. The amount that Catalfano received in exchange for the release will "be set off against any recovery that he might obtain in the suit." *Fleming*, 27 F.3d at 261.

In sum, Catalfano can challenge the validity of the release, and it is plausible that the tender requirement does not apply. The motion to dismiss on these grounds is DENIED.

**CONCLUSION**

Accordingly, Defendants' motion for leave to file a reply, ECF No. 27, is GRANTED. The Clerk is DIRECTED to file the reply, ECF No. 27-1, on the docket. The motion to dismiss, ECF No. 23, is DENIED.

Entered this 2nd day of November, 2026.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE